Steve Shadowin on behalf of the plaintiffs. The Supreme Court in Abbasi strongly reaffirmed that whatever may happen with respect to Bivens actions in other contexts, a Bivens action remains available to plaintiffs who bring claims of excessive force against domestic law enforcement officers. That's what this case is. The Supreme Court says that the Bivens claim in this context has been woven into the fabric of constitutional jurisprudence. You said in this context. Do we have a new context here? We do not believe that we do, Your Honor, but as I will get into the argument will show you, we're not hanging our head on that. We're really planting our flag on there are no special factors here that would weigh against a Bivens action. So you don't concede, but you're not saying there is or is there a new context? Is this a different situation because we have a shooting that crosses international borders? I mean, it seems like a different context than we've ever had before. We believe it's not a new context, but we would rest on our briefing with respect to that and I'd like to devote the time today to the special factors because I believe there's room for disagreement as to whether it's a new context because the court in Abbasi put a very low bar for what's a new context, frankly. And so we are focusing on the special factors. But one of the things that the Supreme Court made clear, and that's what we've been arguing in this case, lo these many years now, and that the judicial review, having a separate branch of government review the executive's taking of human life, constitutes the rule of law. And that's why we believe one of the motivating factors in the Supreme Court not upsetting the Bivens claim in the context of police use of excessive force. And the government in this case has not offered, not articulated, let alone substantiated the way they would have to do that recognizing a Bivens remedy here would in any way interfere with a legitimate government interest of any kind. Just because the injury happened to occur 30 feet across the border. Counsel, I'm still troubled by your answer on the new context. It sounds to me like you were saying reasonable minds could differ if new context, if it's a new context or not, so you were going to move on to something else, but doesn't that have a bearing on the qualified immunity analysis as well? I don't see any connection at all to qualified immunity, Your Honor, because qualified immunity has to do with whether or not the agent knew that a substantive constitutional constraint applied, not to whether the agent knew that there might be a remedy connected to that substantive constitutional constraint. But aren't we debating whether there is a substantive constitutional constraint? And if we're debating it, then how can there be no qualified immunity? The reason is that it's an odd factual circumstance, that is, the government does not dispute, has never disputed during the course of this litigation, that if there were a U.S. citizen standing across the border and was shot by this officer, that the Fourth Amendment would govern that conduct, would apply in that context. And what the Supreme Court said here in rejecting the argument of qualified immunity was that the agent and the government cannot rely upon the fact that it later turned out that Sergio was not a U.S. citizen and, by happenstance, did not have substantial connections to the United States. Those are facts that the agent learned only later. Orquidea's decision of preventing a Fourth Amendment claim to go forward, it seems to define we, the people, as someone who has connections to the United States. Does that prevent a Fourth Amendment claim from going forward? Absolutely not, Your Honor. The we, the people analysis was joined in only by four justices. The fifth vote was supplied by Justice Kennedy, who expressly rejected the premise of the substantial connection test, which is what Your Honor just referred to, the we, the people language. He says that he is not agreeing with that. With respect, sir, Justice Kennedy started out his concurrence by saying, I concur in the opinion of the court. He did concur in the opinion. He did not concur. Well, that's not a, he may have had his other additional reasons, but we don't say lightly that we concur in our fellow judges' opinions unless we concur. Right. But Justice Kennedy, I think the court has to make what it will. He says I concur, but he says I expressly do not place any weight on the fact that the Fourth Amendment starts off by saying we, the people. But Judge Prado, the Fifth Amendment clearly does apply here if the Fourth does not. As you wrote for the original, in the original panel decision, that there is no similar language of we, the people in the Fourth Amendment. Quite to the contrary, that amendment speaks in broad terms of protecting all persons. And there . . . I wanted to go back to the Bivens question. And one of the rationales for Bivens being created in the first place was it was perceived to be incongruous that state officials, local officials could be accountable under Section 1983 for violating constitutional rights, but federal officials weren't liable for violating federal constitutional rights. So what should we make of the fact that 1983 actions can only be brought by citizens, or I think those in the territory of the United States? I think there's two questions. One, do you agree that if a state law enforcement officer fired the shot across the border, that there would be no 1983 claim against the state officer? And then two, if so, how does that impact the Bivens analysis? Because it seems to me if Bivens was trying to create remedies equivalent to 1983, this would be going beyond 1983 remedies. Well, I don't have to get to the second part because I absolutely disagree that there would be no claim against a state agent. The language is in 1983 there's a claim on behalf of the United States, citizens of the United States, and persons within the jurisdiction thereof. And there's absolutely no indication that in using the term jurisdiction thereof, Congress has intended territorial jurisdiction as opposed to within the effect of control or affected by the conduct of the United States. But it's talking about the plaintiff, the person bringing the suit has to be a citizen or within the jurisdiction thereof. Right. Have any cases analyzed that within the jurisdiction thereof in similar situations? Not in terms of whether or not there would be an extraterritorial application of the statute. We're right back to where we are. We would be debating. Well, the second part of my question, assuming you're wrong in interpreting 1983 and there would be no 1983 action here against a state official shooting across the border, how would that impact the Bivens analysis? I don't believe it would significantly affect it. I think the court should deal with that because there would be a disjunction between the two. But I don't believe that a desire to create a parallel federal remedy was a significant driving force in the creation of Bivens. The real driving force there was the court thought it would be anomalous to conclude that there is a societal value that's so important that it was placed specifically into the Constitution but then have no remedy for individual persons who were the subject of a violation of that very important right. That really, when you look at Justice Harlan's concurrence in Bivens, that was the driving rationale. We have these important constitutional rights. They are meant to protect individuals, especially constitutional rights and the Bill of Rights, which are individual rights that the citizenry demanded be put into the Constitution. How about if we come back to Abbasi and the reason the Supreme Court, you know, remanded the case to us and Abbasi emphasizes that Bivens is A, it's disfavored, and B, that there is separation of powers concerns underlying the Bivens remedy. Right, but before the Supreme Court gets to saying it's disfavored, it says that nothing in this opinion, very broad language, nothing in this opinion casts any doubt upon the continued vitality and necessity of Bivens claims for excessive force. Well, disfavored suggests something about extending it, which is what you're trying to do here, and the fact that Bivens itself was Fourth Amendment is certainly not a basis for extending Bivens because the Supreme Court has said we do not apply it on an amendment by amendment basis. No, but the Supreme Court starts the opinion by saying that nothing in this opinion... Well, that's fine, but you're just talking in what you might describe as airy generalities. Why don't you get down to the precise facts of this case, which is an extension of Bivens to a cross-border shooting of an individual who had no connection whatsoever with the United States. Okay, so let's... What's special factors? Why are there not special factors, counsel? Right, so let's take national security first. With respect to national security and foreign affairs, the Supreme Court says what the courts should not do is allow the government to come into court and wave their hands with a talismanic incantation of national security and foreign affairs. So let's start there. What has the government done to articulate specifically the way in which the recognition of a Bivens claim in this context, where the victim is across the border, would endanger this nation's national security? And the government, there's no way they can do it for the following reasons. They can see that there will be and will remain a Bivens claim in behalf of a U.S. citizen standing five feet inside the border doing exactly the same thing that the plaintiff here was doing or what the agent thought he was doing. They acknowledge that there's a Bivens claim there. Five feet inside the border. They acknowledge further that their own substantive regulation governing all Border Patrol agents provides that the imminent peril standard will govern their conduct. They cannot use lethal force against someone unless the agent or some other person is in imminent danger of death or serious injury. So there's no foreign affairs consequences. For instance, you have some person patrolling a U.S. embassy in Paris and an attacker comes toward the U.S. embassy and there is imminent fear that the attacker has explosive IEDs on his body and the person kills him. You're not saying that would involve any kind of foreign affairs consequences? That clearly would, Your Honor. What's the difference between that and this? Because an embassy is American soil. The difference between that and this is that's a responding to terrorism. Everybody agrees that with respect to military conduct there generally has never been, I believe, the allowance of a Bivens claim. Well, obviously the officer was responding to something in this case. He wasn't just doing target practice across the border. Well, we're here on a motion to dismiss the complaint. I understand that, but you can't assume that anything across the border is not significant. Well, I think you put the hammer on the nail head there and that is, in order for the government to succeed on any kind of foreign affairs or national security special factor in this case, they have to make it not this case. What if it's just instead of military at their base, what if it's Border Patrol hot pursuit of human smugglers, a terrorist trying to cross the border, cartel trafficking, and they have a drone and it strikes? Those people would have Bivens actions against the Border Patrol? With respect to a drone, Your Honor, I think these issues go to not so much a Bivens claim but whether or not the Fourth or Fifth Amendment would apply in the first instance. I'm just wondering would those implicate special factors if it were Border Patrol just with that type of urgent pursuit, so not an embassy and not the military? It's very realistic to think that Border Patrol would be in pursuit and a casualty would occur. They would not be special factors under the Bivens analysis. They might well counsel against the extension of Fourth and Fifth Amendment protections in the first instance. One of the virtues of deciding cases on a case-by-case basis is you can take those sorts of considerations into effect. But in terms of special factors, the fact that this injury occurred just across the border or that it was a Mexican national are pure happenstance. Is that really happenstance? I mean these particular facts in this case seem to me, accepting as true your complaint, and I'm not saying this justifies the shooting, but that the young man was playing chicken, essentially, with the border, which does suggest that he did not have any connections to the U.S. and to the extent that matters, somebody running right up to the border and running back does not seem to me to be someone who thinks they have the ability to just cross the border. And why doesn't that go to the qualified immunity analysis, which looks at the point of view of a reasonable officer? Would a reasonable officer perceive this as somebody who had connections to the U.S. that would allow them to be lawfully in the U.S.? The government, in fact, suggested exactly that for the first time in this litigation in the letter brief here, that is that the officer may well have had reason to believe that Sergio was not a U.S. citizen. We think that's waived because it hasn't been brought forth until now, and there's no— Isn't it your burden to negate on qualified immunity what a reasonable officer perceived? I mean, the Supreme Court said you don't know these facts, and that's a fair point, and that was what everybody was focused on initially, but here the question is, what would a reasonable officer perceive? If somebody's reaching for their pocket, they may just be trying to pull out their cell phone, but a reasonable officer could think it was a gun and shoot them, and we have a lot of those cases. And we say, you know, it would have been reasonable to think it was a gun, even though it turns out not to be. So here, why isn't it reasonable, to the extent it matters, why isn't it reasonable for the officer to perceive this as someone who doesn't have lawful connections to the U.S. by the conduct alleged? Again, not saying that justifies shooting him, simply asking why that wouldn't justify a reasonable officer to perceive that. Right, because it is unlawful for any person, not just the Mexican national, to try to enter the country at any place other than a port of entry. So let's start there. That's 19 U.S.C. section 1459A. So the fact that someone is illegally trying to enter the country says nothing about whether they are a Mexican national or a U.S. national. And teenagers of any nationality are the same. They play chicken, whether they're Mexican nationals or U.S. nationals. A surgeon could well have had dual citizenship and be doing the same thing, playing a game out in the cold. So I don't think that any reasonable officer could believe that just because a child is playing a game that that makes them, that they must be not a U.S. citizen. Well, they don't have to say that they must be not a U.S. citizen. In fact, it's your burden to come forward with clearly established law that says where the officer does not know whether or not they're a citizen, that it is, that they're not entitled to qualified immunity. So what is the best case you have to show that you wouldn't be entitled to, that the officer should, that there's clearly established law against the officer's position if he does not know and is completely flummoxed as to whether they're a citizen or not? It's a Hernandez v. Mesa Supreme Court case. This case. This case does not say that, other than this, this case does not say if the officer doesn't know. It says that the court was incorrect for assuming a fact in favor of the officer, basically. And so whether the officer doesn't know one way or the other, what is the best case that says that there is liability? With respect, Your Honor, it's this case because the Supreme Court, in rejecting the qualified immunity in this case, restated what the standard is and said it has to be, a qualified immunity analysis is based upon the facts that are known or knowable to the officer at the time. Okay. If it is not this case, do you have any other case that supports that there is not qualified immunity here? Well, the cases that I don't have them at my fingertips, but it's the cases that the Supreme Court here cited for that proposition. And let's step back for a moment. Again, the basis of the absence of qualified immunity is that it's clearly established that a U.S. citizen, that this officer could not lawfully kill a U.S. citizen or a person with substantial connections to the United States, absent the imminent peril standard. I don't think that this court wants to issue a ruling that says, well, this person in the next case turned out to be a U.S. citizen, but the officer didn't know for certain that he was a U.S. citizen, so he gets qualified immunity. You don't want the purpose of qualified immunity is to protect . . . I was letting you finish responding to Judge Elrod. Have you completed your answer to her, because otherwise you have a red light? Have you completed your response to Judge Elrod's question? I have not, but very, very briefly. The point is if a U.S. citizen, the court doesn't want to issue a decision that says the next case, it turned out the officer wasn't certain it was a U.S. citizen, so it was reasonable for him to go ahead and kill. The purpose of qualified immunity is to protect officers who do reasonable and lawful things. All right. Thank you. Thank you. You've reserved your vote now. Mr. Gellerant, is that how you pronounce it? How do you pronounce your . . . Gellerant, Your Honor. Gellerant. All right. May it please the Court, Lee Gellerant from the ACLU, appearing as amicus to address the Bivens question, the threshold Bivens question, in light of the Supreme Court's Abbasi decision. It would be a radical departure if this Court were now to hold that there's no Bivens claim, no Bivens remedy in a nonmilitary case involving excessive force for a law enforcement agent on U.S. soil. Excessive force is just different. As the Supreme Court has made clear, as this Court has made clear in a variety of decisions, the Supreme Court has never questioned having a Bivens remedy in an excessive force case. Is this what you argued in the Abbasi case, where there were excessive force claims? Well, Your Honor, I was not the counselor. It's your position. So those were conditions and claims and length of detention claims, so they were not excessive force. And I think the Supreme Court went out of its way to say that Bivens was still available for excessive force claims. And Justice Thomas in Hernandez v. Mesa and Abbasi was the only justice, joined by no other justice, to say he would limit the three Bivens cases from the Supreme Court, Davis v. Passman, Crossley v. Green and Bivens, to their precise facts. And at the end of the day, I think what really drove Abbasi— So the Court deliberately remanded our Hernandez case, which had been decided on the relatively narrow basis of qualified immunity, it deliberately remanded and said, look hard at Bivens because there are very tough issues about international law down there or the extension of the Constitution to extraterritorial activity. And so now you're telling us, without moving to the substantive claims yet, that we're radical because we might deny Bivens' claim as the Supreme Court has uniformly done for 30 years. Your Honor, I don't think that the Supreme Court dictated the results. And I think, in fact— I'm not saying it— Yes, Your Honor. And I think if they thought that it was clear there was no Bivens action, they would have decided it because they, in fact, did decide one of the issues. They decided the qualified immunity issue. I think what the Court was doing—I mean, I don't want to over-speculate, but this Court, en banc, did not address Bivens. And I think, you know, in fairly standard procedure, they remanded in light of an intervening case. How does Abbasi differ—the facts of Abbasi differ from the facts we have here in the Hernandez case? Yes, Your Honor. I think in four critical respects. One is, and I think central to Abbasi, is that they're challenging policymaking. And even Judge Raggi below, who dissented in Abbasi, said it's very different when an individual officer is acting contrary to policy, which he called a rogue officer. So I think that was critical. The Court could not emphasize that enough, that challenging policymaking was different, and that's not what Bivens is about. The second factor is how high-level the officials were. It was principally a case against the attorney general and the former FBI director. The third was that it was the 9-11 context. And I don't want to dismiss that Border Patrol are ever involved in national security or foreign relations. That would be an overstatement, but I think it does not compare what's going on here to Abbasi. The Supreme Court was absolutely clear that this was the 9-11 context. It was the worldwide responsibility. So you're saying there would be a difference if the officer saw a couple of people on the other side of the border, one of whom was being forced toward the border, obviously bearing some kind of weapon, say, you know, the bomb strapped on to her, and she's being pushed by another person toward the border. So you're saying that that person who appeared to be a victim, albeit she was a victim, a weaponized victim, that she could have a Bivens accent, right? What would be the different situation there? Your Honor, I think that question is the same as Judge Higginson's question. And so what I think is that you can always come up with examples. Even with the FBI and Bivens, they do national security work. And I think what would happen is there might be a Bivens, but a terrorist is not going to bring a Bivens action, and it would be thrown out immediately because you're not going to be able to plead a Fourth Amendment violation. So I think ultimately those kinds of cases may prove too much because they would really swallow Bivens whole. The FBI is involved in national security, and those same hypotheticals could constantly come up with the FBI or any other place the Supreme Court has repeatedly recognized a Bivens action. So I think that's where those cases – the rare case in which that is happening. But certainly if there was a bilateral operation to stop terrorists, to stop cartels, if the military was involved, all those things would involve different types of situations than what Judge Rodger in the Second Circuit in her dissent called the rogue officer. There has to be some deterrent. There is simply no other remedy here. And I want to address very quickly Judge Costa's question about 1983. You've got a red light, Mr. Gillert. I'll give you one sentence. Okay. The language in 1983 I think was to mirror the 13th Amendment territoriality, and also state actors don't generally act abroad, so I think it wasn't on Congress's mind. Thank you, Your Honor. In this case you said you were here as an amicus, but I think in this specific case you were here more as an amigo. I'm sorry, Your Honor? Thank you, Mr. – I thought you were giving me extra time. All right. Mr. Ortega? Am I right? Fine. I was just going by my script. May it please the Court, Mr. Chief Justice. I haven't been elevated. Just the Chief Judge. Chief Judge, I apologize. The Court was clear that expanding Bivens is disfavored. An extension in a cross-border shooting is certainly an extension. So on remand, we're going to look at the special factors, counseling, and hesitation. And once we apply those special factors to an implied cause of action like Bivens, we can see that it's in a new context. And the Court was clear that it's very reluctant to expand any implied cause of action in new context, and that's what presents itself in this case. You would agree that if we were going to expand it, this would be the most sympathetic place in which to do it. I mean, there's no military here. There's no border issue here. I mean, just shooting an unarmed teenager essentially who's playing a game in his own country, that would sure be a situation if you were going to expand that you might consider it, right? Except sympathy is not a special factor, and sympathy shouldn't play no role. But it's the absence of all of the other factors that your opponents have talked about, the military, the this, the that, the border protection. I mean, none of that's really present here. It just seems like a random shooting. Well, along the border there is drug smuggling, alien smuggling, and narcotics smuggling that occurs on a daily basis. So at a minimum, I think that area is at least quasi-military. So I would respectfully disagree. So is Chicago quasi-military? Is Chicago? But Chicago is not. It has a lot of murders, a lot of drugs, but it's not an international border. We're not dealing with drugs, and we're not dealing with a foreign sovereign in Chicago. Can Mexico authorize its officers to shoot into the United States? I cannot speak to Mexico law, Your Honor, and I apologize. I know nothing about Mexico. But the area where this occurred is certainly quasi-military. And when you look at the shooting occurring in foreign soil, it certainly makes this case unique and different in a meaningful way from Bivens itself. And so then we get to the special factors counseling hesitation. And I think that interference with the executive branch is certainly a concern and a special factor that the court should consider, including— The executive branch decides to just start shooting unarmed teenagers across the border. Is it really that terrible for people who care about the rule of law to intervene? Well, wouldn't it be— That's the whole idea of we have three branches and so on, so we can't just have an executive run them up. We can't have a judiciary run them up, et cetera. I mean, it's the three branches. We have a role here of some sort. We've always been very respectful of the other branches. But the argument here is there was nothing executive about this at all. This is just a murder. I would agree, except that the proposition has been forwarded that this is more than a single incident but a pattern. And certainly that's proper for policy from Congress, who has considered this issue previously. They had the alien tort statute, and they had the foreign torts claim that. So certainly, at least on those two occasions, they had the opportunity to create remedies for foreign nationals in foreign countries. They chose not to, and I think their silence speaks volumes. They have had—Congress has had since the inception of the international border to create a policy in order to provide a damages remedy for foreign nationals, and they have chosen not to. And I don't believe that their silence was inadvertent. And it's also correct that this doesn't lack a remedy, even though it's not a damage remedy, because Agent Mesa was investigated about five times by various subparts of the DOJ and so on, and then not charged with a crime, isn't that—nor extradited to Mexico, correct? That's correct, and that would be another intrusion on—that would be violative of the separation of powers doctrine, because the executive has already determined that Agent Mesa is not only acting within policy, but he didn't commit a crime. And so for the courts to come back and say or issue an opinion that it would in any way be contrary to that would certainly be invading the province of the executive branch. If this would have happened in the United States and his own agency cleared him of any wrongdoing, would that prevent the family of the U.S. citizen from bringing a Bivens action? But that, Your Honor, is certainly very different from the tortious conduct occurring in a foreign country. The border is not liquid. Well, but my question is would it prevent a Bivens action by the family simply because he'd been cleared by his own agency? I don't believe so, Your Honor, but the distinguishing factor would be that he would be within the jurisdiction of the United States. He would actually be in the United States. Mr. Hernandez was in the sovereign Republic of Mexico. And then you become—the court is left, and lower courts will be left with a very vague and line-drawing process. But Officer Mesa was in the jurisdiction of the United States, wasn't he? He was absolutely in the jurisdiction of the United States. But isn't it correct that the Tort Claims Act has their law enforcement provision? It does, but it doesn't provide for redress for— In cross-border situations. Absolutely. Well, isn't that a very significant telltale about Congress's intent? Absolutely, and that's why I had mentioned to the court earlier that they have had various times since the inception of the border to consider this. And the fact that border violence or issues surrounding the border, especially in this area, are new or novel is certainly not the case. The shooting occurred right after he crossed the border, and Mexico wanted to extradite the agent, and we refused to. We investigated—the government investigated the agent and refused to prosecute him. Wouldn't the same concern about separation of powers and intruding on those determinations be present if he were one or two feet on the Texas side of the border? If Hernández was one or two feet on the Texas side? No, on the team. If the agent crossed the border in Mexico. I'm sorry? Are you talking about Mr. Mesa being in Mexico or Mr. Hernández being in the United States? I'm talking about the shooting occurring both with the agent and the decedent being in the United States. Yes, absolutely, it would make a difference if everybody was— It acknowledges a Bivens remedy there. It acknowledges a Bivens remedy, even though the same concerns about interfering with foreign affairs would be present? Well, I don't know if those same concerns are present because now we're dealing— Tell me how they're different. Well, so— Mexico wanted to extradite the Border Patrol agent. Oh, you're talking specifically as to the extradition? Well, isn't that one of your foreign policy concerns? You tell me what your concerns are. Well, it would be policymaking in terms of the regulation of the border itself. It would be the policy of the Border Patrol. I mean, the Border Patrol and the way that that agency actually functions is certainly impacted and are directed by the policies of the executive. You can't get around that. Border Patrol agents have already been sent to prison and are currently being prosecuted for excessive force within the United States against aliens, correct? That's correct, and they were actually— That's not an issue. You know what I mean? They were actually prosecuted in the Western District of Texas in front of—in a different case, in front of the United States District Judge Kathleen Cardone, and they obtained convictions in that court as well. And so convictions—and if you have a conviction, that certainly goes to the remedy. But again, even though there'd be that alternative remedy of a criminal conviction, it wouldn't preclude a Bivens action in that situation. I don't think it would. But you also have bootstraps to the conviction, the restitution provisions that are appertaining thereto. If the Texas government goes against Mesa here, who would pay that judgment? The government pay it, or would it come out of Mesa's pocket? Your Honor, Mr. Mesa doesn't have the money to pay it, so I don't know who would pay it. I mean, are there any regulations about when the government picks up the tab? Well, it—Your Honor, I don't have the answer to that. Counsel, you had said—you were talking about the border wasn't fluid and that sort of thing. Is Justice Breyer's dissent and the points about the Culver being this quasi-border area and the Treaty of Guadalupe Hidalgo and all of that, is that still in this case, or has that issue been—is that not in the case anymore? Your Honor, I remember that specifically, and when Justice Breyer was talking about that, he was also talking about ships going into port in that area, which certainly is not the case. So I think the area is very different than what was articulated by Justice Breyer, both in his dissent and in the case itself. Is the other side still arguing that the border is this fluid thing, or is that argument not part of this en banc at this stage? Is the plaintiff arguing? Yes. Do you know? Do you have a viewpoint on that, of whether that's a live argument? Well, Your Honor, I certainly think that their argument is that the protections of either the Fourth or the Fifth Amendment, and I think of the two, the Fourth Amendment would be the proper vehicle. I thought they conceded that this was transnational. I mean, that's the whole basis of the case. It's transnational. That's correct, Your Honor, and I was getting to that point. Oh, thank you. Thank you. So invocation of an implied cause of action would also invade the province of Congress, in my opinion. Bivens actions have not – they've been presented in multiple other – on multiple other occasions, and for 30 years the courts have refused to extend a Bivens cause. As I had mentioned previously, Congress has had many opportunities to consider damages remedies. When considering a damage remedy, I think it's important to think about the costs that are going to be incurred in terms of the defense and if the government is held liable in terms of a money judgment and in their indemnification. This is certainly a matter for Congress and not a matter for the courts to bleed over and to invade the province of Congress itself. But cause of actions and remedies should be committed to Congress. They write the law. The courts – Could we move past this for a second because Bivens doesn't mean anything unless the Constitution is violated and the plaintiffs would take the position that both the Fourth and Fifth Amendments are at issue here and the court would have to decide those issues. With regard to the Fifth Amendment, we have some water under the bridge now several years following Boumediene. Has any court applied Boumediene beyond the specific facts of detainment at Guantanamo Bay? Other than the recent – they may have cited in the recent executive order cases which are on appeal, but are there any others? No, Your Honor, and I think that the distinguishing factor and why Boumediene has not been extended is because in that case the United States exercised exclusive control over Guantanamo Bay for a very long period of time and so in essence the United States jurisdiction flowed to Guantanamo Bay by virtue of its unfettered control. And you would hold with the position that Verdugo does not allow extraterritorial application of the Fourth Amendment? Absolutely not. In fact, Verdugo presented stronger facts that were rejected by the court in so much as Mr. Verdugo was inside of the United States at the time the search occurred in Mexico. In this case, Mr. Hernandez was never inside of the United States. He was always in Mexico and the act occurred in Mexico. Verdugo had a much stronger underlying fact pattern in this case and the court refused to extend it. Do you think that the Supreme Court wanted us, wanted this court to rule on the basis of the Bivens claim or that we had a viable second chance to decide the case based on immunity or that they were telling us to take the first shot at the substantive claim? Well, Your Honor, I think that my opinion of the Abbasi case is that once the special factors are applied, there is no cause of action. Both the Bivens cause of, implied cause of actions are foreclosed. So you think that's what the court was basically hinting? I don't think they were hinting, Your Honor. I think that they were very clear that they were sending this case back for this court's consideration using a special factors counseling hesitation analysis to even get to a Bivens claim. I think that that's the antecedent question before we reach either the Fourth or the Fifth Amendment as vehicles for redress. Because the appellant's claim doesn't fit any of the, this is shifting gears. Assuming we get past the special factors counseling hesitation, I certainly believe that this case does not fit inside of the three previously decided Bivens cases by the court. Thank you. Let me just ask you a closing question since you're amicus from the government. Given that this case is once in bank, it's back in bank, sent back through the court, from the standpoint of the government, what is the narrowest holding the Department of Justice is advocating to come out of this case? Well, I'm not arguing for the Department of Justice, but I don't think any holding can be narrow enough. Okay, maybe I'm mixing it up. You're amicus for whom? Okay. Just to clarify. All right, you've got it. All right, you switched up on me. Sorry. I'm amicus of the court, Hashim Mupan for the United States. Sorry for the confusion about the order. I think that to answer Judge Stewart's question, the narrowest ground and the ground most consistent with both the Supreme Court's remand order and principles of constitutional avoidance is to resolve this case on the grounds of the absence of a Bivens remedy. We think that there are three strong special factors that counsel against recognizing a Bivens remedy in this context. I'd like to start first with what Congress has spoken to on this issue, and specifically I'd like to address Judge Costa's question about 1983. If you look at the language of 1983, it's limited to U.S. citizens or other persons within the jurisdiction. A plain reading of that clearly does not encompass people outside the country. And so if these exact facts occurred, but it was a Texas Ranger rather than a federal officer, 1983 would not apply. Now plaintiff's counsel suggested maybe there's some ambiguity. They even suggested maybe Congress didn't think about it. I don't really think there's much ambiguity, but even if they were right about that, they still lose because of the presumption against extraterritoriality. You need to have a clear statement before a federal statute will be applied abroad. The Supreme Court made this very clear in RJR Nabisco. So there's just no argument that 1983 clearly extended the foreign injuries. And so it is the case that if these exact facts happened with a Texas Ranger, there would be no liability. And given that, it would make no sense under either separation of powers principles or the Supreme Court decision in Abbasi to say that there is liability for a federal official under an implied cause of action, but there is not liability for a state official under an express cause of action. 1983 is not the only reason to reach that conclusion. As Judge Jones pointed out, the FTCA is of similar piece in that Congress created a foreign country exception to the United States' liability. And again, it makes very little sense where if Congress has foreclosed expressly liability in these circumstances for the United States, a court should imply a remedy for under Bivens. Who has jurisdiction in this culvert? I mean it's sort of like no man's land between Mexico and the U.S. So does the U.S. have jurisdiction or does Mexico have jurisdiction or both do or no one does? The United States has jurisdiction on the United States side of the border. Mexico has jurisdiction on the Mexican side of the border. So is there a yellow line painted down the middle of the culvert or how do we know where one starts and one ends? My understanding is that there's not a line. It's based on geography of what's the midpoint of the culvert. So there's sort of this gray area? There's not a gray area. Well, the concrete is gray. Fair enough, Your Honor. But the line is clear even if it's not apparent, and the line is the midpoint of the culvert. This is Mexican land where the injury occurred, and that is extraterritorial both under the ATS and principles of extraterritoriality and under the Fourth Amendment itself because under the Fourth Amendment they're bringing a challenge to a seizure, and the seizure only occurs where the shooting occurred, not where the trigger was pulled. I'd like to make a couple other points about the presumption against extraterritoriality because I think they're pretty important in this case. The first is they've emphasized repeatedly that we have not identified a concrete impairment to foreign affairs, and that's both irrelevant and wrong. The Supreme Court in RJR Nabisco emphasized that even if there isn't a conflict per se with foreign law, you should not apply federal statutes abroad without a clear statement from Congress, and the Supreme Court has said the same thing in the Bivens context. If you take a look at, for example, the Supreme Court's decision in Stanley, Stanley, which by the way had quite remarkable facts where the government was alleged to have drugged U.S. soldiers with LSD without their knowledge, and the Supreme Court still said no Bivens remedy, the plaintiffs in that case made the same exact argument that the plaintiffs here are making, which is that there would be no concrete effect on military discipline to recognize a Bivens remedy on those specific facts, and the Supreme Court quite clearly rejected that position. The Supreme Court laid out, we could draw the line at a bunch of different spots. We could draw the line at a showing of military harm. We could draw a line at whenever there's a case that involves a superior and inferior officer, and they said we're not going to draw the line there. We're not going to require a particularized showing. We're going to draw the line at anything that's incident to service. In this specific case, we do not have a foreign country objecting and it turning into a big international incident with regard to Mexico objecting to constitutional rights being extended to this culvert. Is that correct? As a matter of fact, I guess Mexico is encouraging it through the amicus brief that Bivens be extended to this culvert. That's exactly my point, Your Honor. In RJR Novisco, for example, it was the European community that were the plaintiffs. They too were asking for extraterritorial application. They too didn't object, and the Supreme Court emphasized that even if there isn't a direct conflict, even if there aren't foreign sovereigns clamoring at the door saying don't extend foreign law, federal law to foreign countries, unless there is a clear statement from Congress, federal law does not extend extraterritorial. And if that is true for an express act of Congress, it is a fortiori true for an implied judicial remedy, which the Supreme Court has emphasized is disfavored because of the separation of powers concerns. It simply makes no sense that Congress has to speak clearly, but the judiciary can imply a remedy without any clear statement whatsoever. But I would like to also point out that there are serious foreign policy issues, even though Mexico on the facts of this case would be okay with recognizing a remedy there. The first is on their theory, the question is why is this not extraterritorial or why is this permissible and not a special factor? At times they've suggested it's because this happens in the culvert and there's something special about the culvert, and it's like Justice Breyer's questions. Well, it seems to me that would be a remarkable foreign policy issue to have this court say that sovereign Mexican land, land that is both de jure Mexican and de facto Mexican, that there is no resemblance to Guantanamo Bay, where the United States had absolute, total, complete control for a hundred years. For this court to suggest that Mexican land is no different than Guantanamo Bay would be a remarkable thing for a federal judiciary to do and be a remarkable thing to do without congressional imprimatur. That is the sort of thing that political branches should do. And if they don't go with the culvert rationale, if they say, no, no, no, we're not saying that you have total control over the culvert, well then it reaches well beyond the culvert, it reaches well into everywhere abroad and foreign policy implications of that are just patently obvious. In addition to that point, there are several others. When the United States or United States citizens impose injury on aliens abroad, that is the sort of thing that normally is resolved diplomatically between the two sovereigns. And for the courts to intervene with that would be to intrude on very sensitive diplomatic negotiations, both with respect to the policies, with respect to potential payments, through ex gratia payments or otherwise, with respect to extradition. All of these are things that are subject to negotiation between foreign sovereigns in our country. And for the judiciary to intrude on that would be a grave thing. If there are no other questions, I guess I should— I have a question about the government relying on criminal prosecution as an alternative remedy, which clearly there's a pending case. There are instances in which Border Patrol agents can be criminally prosecuted. But I have a couple of concerns with that. One, unlike just about all the other alternative remedies in Bivens' cases, it's not one that the plaintiff can directly initiate. Two, isn't it always going to—just about always going to be the case that when there's a civil rights violation in Bivens itself, that defendant could have been prosecuted as a crime since violating civil rights is subject to criminal prosecution? So what would be a situation where criminal prosecution would not be an alternative remedy, or does that mean that special factor is always going to weigh against? It's just one factor, I acknowledge, but— Well, so let me be clear. We're not asserting that the existence of criminal prosecution is itself a special factor that counseled against the Bivens remedy. Our point is that there are numerous other special factors, the fact that the Congress has intervened, the presumption against extraterritoriality, and the foreign affairs issue. They are arguing that there are no remedies. And in response to that, we have two points. The first point is that it doesn't matter, that the Supreme Court has made clear in cases like Stanley and Schweiker that even in the absence of any remedy, any remedy, if there are other special factors, there shall be no Bivens remedy. For example, in Stanley, where the government drugged a soldier with LSD, and there were no other remedies— Sure, no, it's certainly not this positive, but just so I'm clear, the government's—it is one of the special factors, as I read it now. It's not an independent inquiry that stands alone. The government's not saying a special factor here is the availability of alternatives. We are saying—so our second response to their argument that, oh, there's no remedies here, is in addition to that being irrelevant, it's also wrong, there are some remedies, one of which is the potential prosecution, but there are several others. First, for example, they could bring a common law court claim. Now, in this case, there was a scope of employment determination made, and so the Westphal Act came in, but they didn't seek judicial review of that. They potentially could have. It's also possible that they could get redress through executive negotiations over ex gratia payments. And, for example, the Supreme Court, in cases like Schweiker and Wilkie, have said that even administrative remedies count when you're analyzing whether there are any remedies. One other point on the Bivens. One of their primary arguments has been to say that considering extraterritoriality would be a form of double counting, that you should only consider that for what the scope of the constitutional right is, but if this constitutional right is extraterritorial, then that's if—and it should be enough for Bivens. And that's simply just not correct. Take, for example, a case, again, like Stanley. In the military context, the rules of the underlying constitution apply quite differently in the military context than in other contexts, but there are still constitutional constraints on the military. Nevertheless, the fact that it was the military was still a special factor that counseled against hesitation and precluded the Bivens remedy there. So, too, under the presumption against extraterritoriality, take a case like RJR Nabisco, the underlying federal statute was extraterritorial. The Supreme Court expressly held that in that very case. But notwithstanding the fact that the statute, the substantive prohibition, was extraterritorial, it was nevertheless a special— it was the presumption that kicked in to say the private right of action for that should not be extraterritorial. And again, if that's true for an act of Congress that's expressed cause of action, then it makes no sense and contravenes all the separation of powers concerns that the Court identified in Abbasi to have a different rule and have a broader rule for an implied cause of action that's extremely disfavored and the Supreme Court has not extended in over 30 years. So we do think that this case should be resolved simply on the Bivens ground, but I would like to turn briefly to the other issues on both the Constitution and qualified immunity. If I could start on the Fifth Amendment, because I think on the Fifth Amendment there's a very clean way to resolve this case on qualified immunity grounds. We have argued that under the Supreme Court's decision in Graham, the Fourth Amendment is what controls claims to challenges to searches and seizures. And you can't bring a substantive due process claim, you have to bring a Fourth Amendment claim. And at a minimum, reasonable judges could disagree about that because judges on this very on-going court disagreed on it the last go-around. And if the judges on this court disagreed about it, then surely at a minimum that is ground for qualified immunity. And importantly, that ground does not turn at all on the issue of after-acquired facts or uncertainty. All it turns on is the fact that the Supreme Court has suggested that the Fifth Amendment doesn't apply where the Fourth Amendment covers this claimant issue, and there is at least ambiguity as to whether that principle should be extended in a situation like this one where the Fourth Amendment doesn't apply because of its extraterritorial scope. On the Fourth Amendment, and more generally also on the Fifth Amendment, I guess what I would say is both Verdugo and Eisentrager are pretty clear that the Fourth Amendment and the Fifth Amendment in general do not apply abroad. Boumediene does suggest that it's not a strict line for de jure sovereignty, but again, Boumediene involved a situation where the government had de facto practical sovereignty in that they had absolute, total, complete control over Guantanamo Bay for over 100 years. The other side has not pointed to a single case ever, and Boumediene did not cite a single case ever where either the Fourth Amendment or the Fifth Amendment has been extended to apply to aliens abroad in situations where there is neither de jure nor de facto sovereignty over that land, and we don't think that this court should do so, and we certainly don't think that such a proposition would be fairly established. If there are no other questions, I'll wish my time. Thank you, sir. All right. Back to you, Mr. Shetland. You have rebuttal. Thank you, Your Honor. I just want to tick through the list of things that stuck out for me with respect to the defendants in the United States argument. With respect to Congress's handling of Bivens claims and generally with respect to providing remedies for persons, non-U.S. citizens injured abroad, it seems to me very important that there is a foreign country exception to the Federal Tort Claims Act, but Congress says that in addition to an FTCA claim, the plaintiff may have a Bivens claim, and it's in the same statutes where they said they could have a Bivens claim, and in that same statute, Congress did not apply the foreign country exception to the Bivens claim. They applied the foreign country exception only to the FTCA claim. That's number one. Number two, Congress, as you know, got into this whole back and forth with the Supreme Court about the handling of claims of the detainees in Guantanamo, and Congress ultimately passed a statute called the Detainee Treatment Act, and it did two things. It said with respect to interrogations of non-U.S. citizens abroad, they were really talking about Guantanamo, the officers who conduct those interrogations shall be immune from civil liability. Further, with respect to conditions of confinement, that Congress in the same statute stripped the federal courts of all jurisdiction to hear anything except habeas corpus claims for detainees in Guantanamo Bay. So there are two things to take from this. Congress thought there could be civil claims with respect to non-U.S. citizens in Guantanamo Bay because otherwise there was no reason to give them immunity or to strip the federal courts of jurisdiction to hear Bivens claims. Well, actually, sir, aren't you running up in both of those arguments against the presumption against extraterritoriality? With respect, Your Honor, if I may finish the point. Certainly. Well, fine. There are two things to take away from the Detaining Treatment Act. One is Congress, the background assumption that there could be civil liability in those contexts, and then Congress's response to that. Congress didn't enact a statute that said no non-U.S. citizen injured anywhere in the world has no Bivens claim. Congress reacted very specifically to that circumstance. So there you have circumstances where Congress had an opportunity to give the government the broad exemption from Bivens that they're asking this court to create, and Congress didn't do it. Now, Judge Jones, let me respond, and I apologize for that detour, with respect to the presumption against extraterritoriality. That actually works in our favor in this case for the following reasons. You read R.J.R. Nabisco, and the Supreme Court says the reason that there is a presumption against Congress extending statutes abroad, a presumption against extraterritoriality of statutes, is this. Two reasons. Number one, Congress is presumed to be regulating conduct. And if the conduct occurs in a foreign jurisdiction, it would be an affront to the sovereignty of those other jurisdictions for our Congress to say we're going to regulate conduct that occurs in your territory. That's number one. And number two, the corollary of that is that Congress, the court assumes that Congress, unless it says otherwise, is legislating with respect to domestic conduct. So the presumption against extraterritoriality has to do with where the conduct occurs. Extraterritoriality in every sense in which international law has traditionally applied it is that the locus of the injury is where the liability and legal consequences flow. The locus is Mexico. We haven't done that analysis either side in this context. Well, it's the Hornbook background law for centuries. With respect, Your Honor, my understanding is, and I looked at this some time ago, is that that is generally the case unless the sovereign where the conduct occurred has the greater interest. But again, that is still extraterritorial. Well, now you may be going to a restatement of foreign relations and more recent in the last 20 or 30 years, but you cannot presume that when Congress enacted the FTCA, it wasn't thinking in these terms. Well, we're beyond the FTCA, Your Honor. Well, I'm not. The FTCA is one avenue of redress. The other is a Bivens claim, which is not subject to the FTCA limitations and is crystal clear that one of the reasons for whatever law, the choice of law analysis is, here the choice of law is it's the United States Constitution. My final comment is a practical one, and that is this family did the most responsible thing that they could do in these circumstances. This was a U.S. officer acting in the course and scope of his employment for the United States on U.S. soil who killed their son. And they did the proper thing by coming and asking the courts of the United States to review the conduct of the loan. Thank you. Thank you, Mr. Chairman. Thank you to all the counsel involved on both sides for the briefing and the oral argument in the case. The case will be submitted. This completes the in-bank oral arguments for the week, and we will stand adjourned.